# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GRETTE FERNANDEZ, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| MIKE BLOOMBERG 2020, INC., | |
| Defendants. | |

Plaintiff Grette Fernandez ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her attorneys, Fegan Scott LLC, for her Class Action Complaint, alleges as follows:

## INTRODUCTION

1.      Under New York law, an employer's oral promise to employ and pay an employee for a period of time that is definite or capable of being determined is enforceable after the employee has begun or provided any consideration or service.

2.      Here, Defendant Mike Bloomberg 2020, Inc., Michael Bloomberg's presidential campaign committee, made just such a promise when it extended multiple offers of employment to thousands of staffers that they would have a job through both the Democratic party's primary and general election (which is scheduled for November 3, 2020). Defendant promised salaries nearly double that of its competitors for the Democratic nomination. In addition to the overall salaries offered, Defendant's promise to employ staffers through the general election was so appealing to applicants (and striking to politicos) because it pledged to employ all staffers through November 3, 2020, regardless of whether Mr. Bloomberg won the Democratic nomination.

3.      At that time, there were already seventeen other contenders for the Democratic nomination, many of which started their campaigns almost a year prior to Mr. Bloomberg's decision to enter the race.  All parties knew that Mr. Bloomberg's path to the nomination was a moon shot. Accordingly, Defendant knew that without a promise of employment for a definitive period through the general election Plaintiff and other members of the Class (defined below) would not have joined Mr. Bloomberg's campaign.

4.      Plaintiff, like the two thousand other Class members, relied on that promise. Plaintiff moved from Washington, D.C. to Pennsylvania, just as Class members moved to other cities in response to Defendant's offers of yearlong guarantees of competitive pay and health benefit packages. Plaintiff and Class members gave up other opportunities, including more secure jobs. Plaintiff and the Class uprooted their lives based on Defendant's promises.

5.      But Defendant publicly breached its agreements with Plaintiff and the Class. After Mr. Bloomberg under performed in the Democratic primaries, on March 4, 2020, he publicly announced that he would be ending his campaign.  Within days of this decision, Defendant began to terminate thousands of staffers, including Plaintiff, leaving them with no employment, no income, and no health insurance – during the worst global pandemic since 1918.

6.      In this lawsuit, Plaintiff seeks to hold Defendant accountable for the promises that it made and thereby protect the economic security of over 2,000 working families and individuals at a uniquely precarious time in the nation's history.

## JURISDICTION

7.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because the matter at issue exceeds $5 million, exclusive of interest and costs, and is a class action in which at least one member is a citizen of a different state than that of Defendant.

8.      This Court has personal jurisdiction over Defendant. There is general jurisdiction

because Mike Bloomberg 2020, Inc. is headquartered in this district at 909 Third Avenue, New York, NY 10022. There also is specific jurisdiction over the action, as the claims arise out of or relate to activities or events in this District, such as the false promises that were made by Defendant in this District.

9.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1), as Defendant resides in this District, and is proper under 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the plaintiffs' claims occurred in this district.

**The Parties**

10.      Plaintiff is a resident of California, and was employed by the Bloomberg Campaign prior to her termination on March 20, 2020. Plaintiff began working as an Organizer for the Bloomberg Campaign on February 13, 2020, and continued to work for Defendant until she was terminated without cause. During her employment with the Campaign, she earned a salary of $6,000 per month and received health insurance and other employee benefits.  Upon her employment, Plaintiff moved at Defendant's direction from Washington, D.C. to Pennsylvania. Among other expenses and lost opportunities, Plaintiff forfeited her approximate $1,000 registration fee for the California Bar Exam scheduled for February 25-26, 2020, in order to work for Defendant through November 3, 2020.

11.      Defendant Mike Bloomberg 2020, Inc. ("Defendant" or the "Bloomberg Campaign") is the presidential campaign of Michael Bloomberg. Defendant is incorporated in Delaware, and maintains its headquarters at 909 Third Avenue, New York, NY 10022.

**FACTS**

**A. Mr. Bloomberg Runs a Last-Minute Moon-Shot Campaign, Hiring Thousands of Employees**

12.    Michael Bloomberg is one of the most successful businessmen in the world, with an estimated net worth of over $55 billion, making him one of the richest individuals in the world. Mr. Bloomberg has used that wealth to fund various political endeavors, including his three campaigns for mayor of New York City.

13.    Since leaving the mayor's office Mr. Bloomberg has become one of the largest political donors in the country and active in national politics. An outspoken critic of President Trump, Mr. Bloomberg stated publicly that he had personally spent more than $100 million to elect Democrats to the House of Representatives in the 2018 midterm elections

14.    After years of public speculation about his desire to hold national office, in March of 2019, Mr. Bloomberg wrote an op-ed announcing that he would not run for the White House.[1] Mr. Bloomberg acknowledged the real challenges facing his candidacy and announced that he would focus his time, and more importantly, money on the broader goal of defeating President Trump in the 2020 general elections.

15.    On November 15, 2019, Mr. Bloomberg announced his plans to spend at least $100 million on an anti-Trump ad campaign in the 2020 elections.

16.    Two weeks later, and eight months after he published his op-ed, on November 24, 2019, Mr. Bloomberg announced that he changed his mind and would be entering the Democratic primaries seeking the party's nomination.

---

[1] Michael R. Bloomberg,  "Our Highest Office, My Deepest Obligation", Bloomberg (March 5, 2019) available at https://www.bloomberg.com/opinion/articles/2019-03-05/our-highest-office-my-deepest-obligation (last accessed April 20, 2020).

17.     Mr. Bloomberg's 11th hour decision to join the race posed numerous challenges for his path to the nomination, notwithstanding his political views at odds with the party's base and his history as a Republican.  Namely, by the time he decided to enter the race, seventeen other contenders had been campaigning for over six months, including former Vice President Biden who announced his candidacy in April 2019.  Furthermore, Mr. Bloomberg's last-minute decision precluded him from being on the ballot in key early voting states, including Iowa and New Hampshire.

18.     Keenly aware of these challenges, the Bloomberg Campaign discussed publicly that its entire strategy and its only viable path to the Democratic nomination was to win on "Super Tuesday"—*i.e.*, March 3, 2020, when fourteen states held their primaries and one third of all delegates are won.

19.     Political commentators noted that the Bloomberg Campaign's strategy was highly "unorthodox"[2] and "has never been successful in Democratic presidential politics."[3]

20.     One advantage the Campaign had though was Mr. Bloomberg's unmatched wealth. Unlike traditional campaigns which vie against one another for campaign contributions, Mr. Bloomberg announced that he would use his vast fortune to entirely self-fund his campaign.  Quick to put its war chest to work, the Bloomberg Campaign spent $30 million on television ads in the first week of its existence.

---

[2] Linda So, John Whitesides, "Media mogul Bloomberg enters U.S. presidential race, takes aim at Trump," Reuters (Nov. 24, 2019), available at https://www.reuters.com/article/us-usa-election-bloomberg/media-mogul-bloomberg-enters-u-s-presidential-race-takes-aim-at-trump-idUSKBN1XY0G5 (last accessed Apr. 20, 2020).

[3] Dan Merica, Cristina Alesci & Jake Tapper, "Michael Bloomberg is the latest 2020 Democratic hopeful," CNN (Nov. 24, 2019), available at https://www.cnn.com/2019/11/24/politics/michael-bloomberg-2020-election/index.html (last accessed Apr. 20, 2020).

21.     Television and internet advertisements alone, however, would not be sufficient to turn Mr. Bloomberg into a viable contender for the Democratic nomination. It was imperative that the Bloomberg Campaign quickly build a robust campaign staff throughout the country, something Mr. Bloomberg's Democratic opponents had spent the prior year doing.

22.     Given the significant impediments to Mr. Bloomberg's nomination scaling, the Campaign's staff was no small task.  In order to accomplish this goal, the Bloomberg Campaign took advantage of Mr. Bloomberg's fortune and public commitment to funding the eventual Democratic nominee through the general election.

23.     The Bloomberg Campaign went on an aggressive hiring spree, promising applicants that it would employ Bloomberg staffers (which include field organizers, deputy field organizers, and regional organizing directors) through the Democratic primary process **and** the general election to be held on November 3, 2020. Material to the Bloomberg Campaign's offer was that it would retain its staffers through the fall, regardless of whether Mr. Bloomberg won the Democratic nomination.

24.     Defendant's promise to retain its employees through the general election was widely understood to be a necessary concession for it to make in order to attract the needed quality and quantity of staff members in the face of such a monumental uphill battle in the Democratic primaries.

25.     The Bloomberg Campaign's promise was repeatedly iterated by its hiring managers. Throughout the hiring process, Defendant's hiring managers expressly stated, without qualification that applicants would be employed by the Bloomberg Campaign through the general election, regardless of whether the former mayor became the Democratic nominee for president. These statements were made by hiring managers at the Campaign's headquarters and by

interviewers at the regional offices where candidates would eventually work.

26.     Specifically, after learning of Defendant's promise of employment through November 3, 2020 and discussing the opportunity with colleagues, Plaintiff submitted an application for an Organizer position.  Plaintiff was then contacted by a Regional Organizing Director for the Campaign for an informal telephonic interview.  On that call, the Regional Director discussed the open position with Plaintiff, stating that the position required a commitment through the general election.  Days later, Plaintiff spoke again with the Regional Director, during which the promise of employment for a definite period was reiterated and she was told that she would be offered the position, subject to a background check.

27.     Defendant was aware that its promise of guaranteed employment through November 2020 was integral to the Bloomberg Campaign's hiring process.  The Bloomberg Campaign had prepared an "Interview Notes Template" for its hiring managers to utilize when conducting interviews with prospective employees. The Template listed five bullet points detailing "at a glance" the benefits of working for the Campaign that hiring managers were to emphasize for applicants.  As shown in an excerpt of the Template below, "***Employment through November 2020*** with Team Bloomberg" was one of the five bullet points listed by Defendant:



**BLOOMBERG 2O2O**

Organizing Team Interview Notes Template

| CANDIDATE NAME: | | AT A GLANCE: |
|---|---|---|
| INTERVIEWER: | | → Org = $6000/month<br>→ $5000 Relocation stipend<br>→ Full health, dental and vision |
| INTERVIEW DATE: | | benefits<br>→ Travel/mileage reimbursement |
| IN PERSON/PHONE: | | → Employment through<br>November 2020 with Team<br>Bloomberg (not guaranteed<br>location you are at now) |

28.     This same promise was also repeatedly touted by the Campaign in public statements and reported in the media.

29.     In January of 2020, the former mayor of New York City gave an interview to *The New York Times*, in which he discussed "spending a billion dollars of his own money on the 2020 presidential race, even if he does not win the Democratic nomination[.]"[4] The article discussed Mr. Bloomberg's plan to convert his campaign into "a shadow campaign operation for the general election, complete with hundreds of organizers in key battleground states and a robust digital operation, ready to be inherited by the party nominee — ***regardless of who that nominee may be***."

30.     In the interview "Mr. Bloomberg said he would mobilize his operation behind any of the Democratic candidates, even Ms. Warren, the Massachusetts senator, or Mr. Sanders, the Vermont senator." Further, Mr. Bloomberg specifically stated in the interview that he planned to keep open and operational his campaign offices through the general election.

31.     Similarly, Kevin Sheekey, the Campaign manager of the Bloomberg Campaign, discussed with NBC News Mr. Bloomberg's "massive campaign apparatus and [his] army of some 500 staffers [that] will march on through the general election in November even if he loses the Democratic nomination…, shifting their efforts toward working to elect whomever the party selects to face President Donald Trump." [5] Mr. Sheekey quipped: "Mike Bloomberg is either going

---

[4] "Michael Bloomberg Is Open to Spending $1 Billion to Defeat Trump[;] The Democratic presidential candidate said he would spend big even if the nominee was someone he had sharp differences with, like Bernie Sanders or Elizabeth Warren" N.Y. Times (Jan. 11, 2020), available at https://www.nytimes.com/2020/01/11/us/politics/michael-bloomberg-spending.html (last accessed Apr. 20, 2020).

[5] Josh Lederman and Stephanie Ruhle, "Bloomberg to fund sizable campaign effort through November even if he loses Democratic nomination; Exclusive: The former New York City mayor plans to continue paying hundreds of staffers and funding his digital operation to defeat Trump even if he's not the nominee," NBC News (Jan. 10, 2020), available at https://nbcnews.to/3dqaAuY (last accessed April 20, 2020). *See also* Mark Niquette, "Bloomberg

to be the nominee or the most important person supporting the Democratic nominee for president,"

32.   The article further noted that it was an "unusual move" for the Campaign to have "committed to paying [its then-roughly 500 staff members] through November" to work in "battleground states like Florida, North Carolina, Michigan, Pennsylvania and Wisconsin, as well as in Arizona."

33.   It was also clear from Mr. Sheekey's interview with NBC News that "[i]f another Democrat wins the nomination, the Bloomberg-funded staffers won't work directly for the nominee," rather those individuals would work directly for Mr. Bloomberg.[6]

34.   After Mr. Bloomberg and his campaign made these public promises to employee staffers through the general election the Campaign went on a hiring spree, reiterating the offer to each applicant.

35.   Following the Iowa caucus on February 3, 2020, in which Mr. Bloomberg was not on the ballot, "Mr. Bloomberg authorized his campaign team to double his spending on television commercials in every market where he is currently advertising and expand his campaign's field staff to more than two thousand people[.]"[7]

36.   Sure enough, after Defendant had amassed 2,100 employees in 125 offices

---

Will Spend to Beat Trump, Even If He's Not the Nominee," Bloomberg (January 11, 2020), available at https://www.bloomberg.com/news/articles/2020-01-12/bloomberg-will-spend-to-beat-trump-even-if-he-s-not-the-nominee (last accessed April 20, 2020).

[6] *Id.*

[7] Jennifer Medina and Alexander Burns, "Bloomberg Plans to Double Ad Spending After Iowa Caucus Problem", N.Y. Times (Feb. 4, 2020), available at https://www.nytimes.com/2020/02/04/us/politics/michael-bloomberg-campaign-ads.html?emc=edit_na_20200204&ref=cta&nl=breaking-news&campaign_id=60&instance_id=0&segment_id=20966&user_id=e9848bda5d7546386411f6e2fbdaf95e&regi_id=16153474  (last accessed April 2, 2020).

throughout the country, on February 27, 2020, Mr. Bloomberg once again made the promise that staffers would be employed through the general election, telling the Houston Chronical "I said that I would help, I'm going to keep our campaign offices, the main ones anyways, open until Nov. 3[.]"[8]

37.     In addition to public statements, Defendant repeatedly made the promise of continued employment in numerous campaign staff meetings.  For example, during a staff meeting held in Philadelphia on February 17-18, 2020, a State Organizing Director for the Campaign discussed with Plaintiff and other staffers the Campaign's plans to keep them in Pennsylvania through the state's primary on April 28, 2020, after which they will be transferred to key swing states until the general election—echoing the promise made by Mr. Sheekey in his interview with NBC News.  In particular, Plaintiff was told that due to her Cuban heritage she would likely be transferred to the Bloomberg Campaign's field offices in Florida following the Pennsylvanian primary.

38.     Due to the constant refrain of Mr. Bloomberg's seemingly bottomless funding and commitment to a Democrat defeating President Trump in the fall, Plaintiff and the other Class members had no reason to question Defendant's commitment to employ them through the general election. Accordingly, Plaintiff and the other Class members accepted each promise, thereby agreeing to continue to work for the Campaign in exchange for the promise of definitive employment through November 3, 2020.

39.     Notwithstanding   Defendant's   promises   of   continued   employment   through

---

[8]  Jasper Scherer, "Bloomberg says he would close campaign offices if Sanders wins nomination and rejects his support," Houston Chronicle (Feb. 27, 2020), available at https://www.houstonchronicle.com/news/houston-texas/houston/article/Bloomberg-says-he-would-close-campaign-offices-if-15089749.php (last accessed April 20, 2020).

November 3, 2020, the Campaign required each of its staffers to sign non-negotiable form contracts of adhesion that characterized the staffers as "at-will" employees who could be "terminate[d] . . . at any time, with or without notice and with or without cause, for any reason or for no reason."

**B.  Mr. Bloomberg Drops Out of the Race, and Defendant Fires the Class**

40.     As many predicted, Mr. Bloomberg did not perform as well as he had hoped on Super Tuesday. Despite spending approximately $500 million during his brief 16-week campaign, Mr. Bloomberg lost all contests on Super Tuesday, except for the territory of American Samoa. On the other hand, former Vice President Biden had a sweeping victory across the nation.

41.     Less than 24-hours after his defeat on Super Tuesday, on March 4, 2020, Mr. Bloomberg announced that he would be dropping out of the race and endorsing former Vice President Biden.

42.     Later that same day, Mr. Sheekey held an "All Staff" telephonic meeting, during which he told Plaintiff and the Class that they should not be making plans to move from their current locations and that nothing would change with respect to the Campaigns efforts to defeat President Trump in November and its planned shift from organizing for the Democratic primaries to the general election.

43.     In the days following Mr. Bloomberg's announcement, Plaintiff and other Class members would come to learn that Defendant had no intention of keeping its promises of employment for a definite period. Specifically, the Bloomberg Campaign began to hold "termination calls" during which staffers were told that their positions at the Campaign were terminated, and that they would no longer receive a paycheck or health insurance coverage come

April 1st.[9]

44.     Following public reports that Defendant terminated its staffers, Mr. Sheekey told NPR that the Bloomberg Campaign had reached out to Class members "and [they] are in the hiring pipeline to join the [Democratic National Committee] organizing efforts[.]"[10]

45.     Notably, employment with the DNC is not guaranteed, and Defendant's facilitation of placing its former staffers in the "pipeline" falls far short of the guaranteed employment through November 3, 2020, it offered and Class members agreed to.  In fact, the DNC had not actually agreed to hire any of Bloomberg's former staffers. Rather, Defendant did little more than send along online job postings to its terminated employees.

46.     Furthermore, the job openings at the DNC that the Bloomberg Campaign forwarded to its staff provided compensation and benefits well below what they received at the Bloomberg Campaign.

47.     Not only were Plaintiff and the Class members taken aback by Defendant's blatant breach of the terms of their employment, news outlets across the country highlighted the Campaign's egregious violation of a material term of its employment offers. [11]

48.     Defendant's breaches resulted in significant injuries to Plaintiff and class members.

---

[9] Christopher Cadelago and Sally Goldenberg, "Bloomberg aides cut loose despite yearlong employment promise," Politico (Mar. 9, 2020), available at https://www.politico.com/news/2020/03/09/bloomberg-aides-fired-year-124741 (last accessed April 6, 2020).

[10] Juana Summers, "'Mike Borrowed My Credibility And Abused It': Fired Bloomberg Campaign Workers Speak," NPR (Apr. 3, 2020), available at https://www.npr.org/2020/04/03/826041256/mike-borrowed-my-credibility-and-abused-it-fired-bloomberg-campaign-workers-spea  (last accessed April 20, 2020).

[11] *E.g.,* Cadelago, "Bloomberg aides cut loose despite yearlong employment promise," Politico (Mar. 9, 2020).

As a result of Defendant's breaches, Plaintiff and the 2000 other Class members unexpectedly found themselves unemployed and uninsured at the beginning of the worst public health crisis in at least a century.  Compounding the harm cause by Defendant's conduct, Defendant terminated the Class as the global pandemic has caused "[u]nemployment claims [to] soar[]" to levels far worse than the 2008 Financial Crisis.[12] Thus, each member of the Class that left or declined other professional or educational opportunities will be forced to re-enter the job market at a time when the U.S. economy is at the precipice of "the mother of all financial crises."[13]

## CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action as a class action under Federal Rule of Civil Procedure 23 on behalf of the following class:

> All employees of Mike Bloomberg 2020, Inc. who were promised and accepted employment through November 3, 2020, and terminated prior to November 3, 2020, without cause. (the "Class")

50.     *Rule 23(a)(1) – Numerosity:* The members of the class are so numerous that joinder of all members is impracticable. Based on publicly available information, there are more than 2,000 members of the Class, and the members of the Class are geographically dispersed across the country.

51.     *Rule 23(a)(2) – Commonality:* There are numerous common questions of both law and fact in this action, including:

    a.   Whether Defendant promised to employ Plaintiff and the Class members

---

[12] Rebecca Rainey & Nolan D. Mccaskill, "'No words for this': 10 million workers file jobless claims in just two weeks," Politico (April 20, 2020), available at https://www.politico.com/news/2020/04/02/unemployment-claims-coronavirus-pandemic-161081 (last accessed April 6, 2020).

[13] Peter S. Goodman, "Why the Global Recession Could Last a Long Time," N.Y. Times (April 1, 2020), available at https://www.nytimes.com/2020/04/01/business/economy/coronavirus-recession.html (last accessed April 20, 2020).

for a period of time that is definite or capable of being determined;

b.  Whether Plaintiff and the Class members began employment or provided any consideration or service for Defendant;

c.  Whether the oral promises to employ Plaintiff and the Class members through November 3, 2020 are enforceable;

d.  Whether Defendant breached its promise to employ Plaintiff and the Class members through the general election; and

e.  The proper measure of damages.

52.  Because the Bloomberg Campaign made the same statements to staff applicants throughout the nation from its New York headquarters and through its regional hiring managers, the answers to these questions will produce common answers for all members of the Class.

53.  *Rule 23(a)(3) – Typicality.* Plaintiff's claims are typical of the other members of the Class because the claims challenge a uniform policy or practice by which the Bloomberg Campaign made the same promises and statements to staff applicants, because Plaintiff brings the same legal claim as the other members of the Class, and because Plaintiff suffered the same injuries as other members of the Class, including the loss of employment, income, health insurance, and other benefits.

54.  *Rule 23(a)(4) – Adequacy.* Plaintiff will fairly and adequately protect the interests of other members of the class. Plaintiff does not have any conflict with any other member of the class. Defendant does not have any unique defenses against Plaintiff that would interfere with her representation of the class. Plaintiff is represented by counsel with significant experience in prosecuting class action litigation and representing workers.

55.  *Rule 23(b)(3) – Predominance.* The questions of law and fact common to the members of the Class predominate over questions affecting only individual members and a Class action is superior to other available methods for the fair and efficient resolution of this controversy.

56.     A Class action is superior to other available methods for the fair and efficient resolution of this controversy. By bringing these claims together in a single class proceeding, the issues will be efficiently resolved in a single proceeding rather than multiple proceedings. Class certification is a superior method of adjudicating these issues because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about the defendant's liability for false statements that were made to campaign staffers throughout the nation and the appropriate remedies for such violations.

**COUNT I**

**Breach of Oral Contract for Employment for a Definite Period**
**(On Behalf of Plaintiff and the Class)**

57.     Plaintiff repeats and realleges the foregoing allegations as though fully set forth herein.

58.     Defendant offered Plaintiff and the Class employment through the general election campaign, regardless of whether Michael Bloomberg was the Democratic nominee.

59.     The offer of employment through the general election, which is scheduled for Tuesday, November 3, 2020, was for a period capable of definition.

60.     Plaintiff and the Class members accepted the offer to work through the general election.

61.     Plaintiff and the Class members either started working for Defendant or took steps at Defendant's request to begin providing services, including relocating their residences.

62.     Notwithstanding its promise, Defendant terminated Plaintiff and the Class Members prior to November 3, 2020. The termination of Plaintiff and the Class was a breach of the oral agreement for employment for a definite period.

63.     As a result of the foregoing, Plaintiff and Class members lost, *inter alia*, income

15

and other promised benefits, and are entitled to damages.

## COUNT II

### In the alternative, Breach of Unilateral Contract For Employment For A Definite Period
### (On Behalf of Plaintiff and the Class)

64.     Plaintiff repeats and realleges the foregoing allegations as though fully set forth herein.

65.     Even if the "at-will" provisions in Defendant's form contracts are found to be valid when made, each time Defendant, through Mr. Bloomberg and other representatives, stated that employees of the Bloomberg Campaign (including Plaintiff and the Class) would be retained through November 3, 2020, a superseding binding unilateral offer was made.

66.     Plaintiff and the Class accepted Defendant's unilateral offers for employment for a definite period through their performance. Plaintiff and the Class accepted Defendant's offers by diligently working for the Bloomberg Campaign subsequent to such offers being made prior to their termination.

67.     In addition to their dutiful work for the Bloomberg Campaign during the Democratic primaries, Plaintiff and the Class reasonably relied upon Defendant's offer for employment through the general election by, *inter alia*, relocating their residences and foregoing other professional pursuits.

68.     Defendant, in violation of its explicit promises for employment through the general election, breached the unilateral contract that was established by terminating Plaintiff and the Class prior to November 3, 2020.

69.     As a result of the foregoing, Plaintiff and Class Members lost, *inter alia*, income and other promised benefits of employment, and incurred significant consequential damages, including foregone professional opportunities.

70.     Accordingly, Plaintiff and the Class Members are entitled to damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendant Mike Bloomberg 2020, Inc. on all claims and respectfully request that this Court award the following relief:

a.  Certify this case as a class action pursuant to Federal Rule of Civil Procedure 23;

b.  Designate Plaintiff as class representative and her counsel as Class Counsel;

c.  Enter an order requiring Defendant to pay compensatory and punitive damages to Plaintiff and the members of the putative Class, and award attorneys' fees and costs; and

d.  Grant such other and further relief as the Court deems proper, appropriate, just, or equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated: April 20, 2020

FEGAN SCOTT LLC

By:  /s/ Jonathan D. Lindenfeld
Jonathan D. Lindenfeld (JL-1990)
FEGAN SCOTT LLC
140 Broadway, 46th Floor
New York, NY 10005
Ph. 212.208.1489
Fax: 917.725.9346
Email: jonathan@feganscott.com

Elizabeth A. Fegan (pro hac vice
application forthcoming)
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Ph: 312.741.1019
Fax: 312.264.0100

17

Email: beth@feganscott.com

J. Barton Goplerud
SHINDLER, ANDERSON,
GOPLERUD & WEESE, PC
5015 Grand Ridge Drive, Suite
100
West Des Moines, Iowa 50265
Ph: (515) 223-4567
Fax: (515) 223-8887
Email: goplerud@sagwlaw.com

Douglas J. Bench, Jr.
101 Carmella Court
King of Prussia, PA 19406
Tel.: (814) 241-7208
DouglasBench@live.com

*Counsel for Plaintiff*